CAROLINA DIEZ RAMOS, representada por su defensor judicial DR. FEDERICO DIEZ RIVAS, demandante y recurrente, *v.* PEDRO JOSÉ DÍAZ DIEZ, OLGA ARMSTRONG e INOCENCIA DIEZ RAMOS, demandados y recurridos.

*Número:* R-62-151      *Resuelto:* 20 de junio de 1963

*Vicente Géigel Polanco, Ángel M. Villamil* y *Vicente Géigel Lanuza,* abogados de la recurrente; *Jorge Luis Córdova, Jorge L. Córdova, Jr.,* y *Carlos Cebollero,* abogados de los recurridos.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente Accidental de Sala y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

PER CURIAM: Por escritura número 77 de 15 de agosto de 1956 otorgada ante el Notario don José Enrique González Quiñones, la recurrente doña Carolina Diez Ramos transfirió a su sobrino Pedro José Díaz Diez el dominio de dos fincas que conforme a su inscripción registral son de naturaleza rústica, pero que según su ubicación actual se encuentran dentro del área urbana de la ciudad de Caguas. La contraprestación del cesionario consistió en a) liberar a la cedente

del pago de un gravamen hipotecario por $5,500.00 de principal y los intereses devengados hasta la fecha del otorgamiento ascendentes a $990.00, así como de otras deudas no garantizadas que sumaban $1,578.29; b) asumir el pago de contribuciones territoriales que importaban $845.46; c) constituir un derecho de usufructo vitalicio a favor de la recurrente sobre una casa y solar sitos en la Calle Manuel Soto Aponte núm. 22, de Caguas, cuyo valor se estimó en $65.00 mensuales; y, d) obligarse a satisfacer a dicha cedente una renta vitalicia de $100 mensuales, cuyo pago se garantizó mediante un gravamen que se denominó censo, constituido sobre un inmueble propiedad de doña Inocencia Diez Ramos, madre del cesionario y hermana de la cedente.

En agosto de 1960, doña Carolina Diez Ramos acudió ante el Tribunal Superior, representada por su defensor judicial Dr. Federico Diez Rivas,(¹) en demanda para que se decretara la nulidad de la escritura a que nos hemos referido y en reclamación de daños y perjuicios. Después de exponer que era dueña de las dos fincas objeto del contrato y de señalar el modo mediante el cual las había adquirido, alegó sustancialmente que es una persona de deficiente desarrollo mental, con un cociente de inteligencia de 40 a 50 y una edad mental de 7 años de edad; que ha sido víctima de frecuentes depresiones nerviosas y ha estado sometida a tratamiento médico, sicológico y siquiátrico, y que había estado recluida en el Centro Siquiátrico de la Escuela de Medicina de Puerto Rico de 18 de marzo a 10 de abril de 1958, y en la Clínica Dr. M. Juliá del 1ro. al 17 de noviembre de 1958, que carece del juicio, capacidad y entendimiento necesario para administrar sus bienes y efectuar transacciones sobre los mismos para lo cual necesita la ayuda, consejo y orientación de familiares y amigos; que los demandados Pedro José Díaz Diez, su esposa

---

(¹) La actora fue declarada incapacitada mediante resolución dictada por el Tribunal Superior, Sala de San Juan, en 28 de julio de 1960, tres años y medio después de haberse otorgado la escritura que se impugna.

Olga Armstrong y su madre Inocencia Diez Ramos han insistido desde el año 1946 para que la demandante les cediera por un precio mínimo dichos inmuebles; que los demandados la indujeron a arrendar una de las fincas a la demandada Inocencia Diez Ramos por término de 5 años, prorrogable por 3 años adicionales, mediante un canon mensual de $40.00, según escritura de fecha 13 de diciembre de 1946; que la demandada mencionada cedió el derecho de arrendamiento a su hijo el codemandado Pedro José Díaz Diez, quien posteriormente, por escritura de fecha 5 de mayo de 1954, indujo y obtuvo que la demandante le cediera nuevamente el arrendamiento a base de un canon mensual de $46.00 por un término de 5 años, prorrogable por 5 años adicionales, con vencimiento en 31 de julio de 1969; que inducida por falsas y fraudulentas simulaciones del demandado Pedro José Díaz Diez, la demandante firmó una escritura pública en 14 de julio de 1956 mediante la cual concedió a los señores Mariano C. Molina y José E. González Quiñones, o a sus cesionarios, una opción de compra de dichas propiedades por precio de $25,000; que posteriormente los señores Molina y González cedieron sus derechos bajo el contrato de opción al demandado Pedro José Díaz por precio de $5,000; que durante los primeros días del mes de agosto de 1956, los demandados, actuando concertadamente, secuestraron a la demandante, llevándosela a la fuerza de su hogar y del lado de su esposo Martín Caballero y la mantuvieron aislada, separada y oculta de su cónyuge durante aproximadamente dos semanas, y en el curso de su secuestro, forzando su voluntad, mediante violencia, amenazas y falsas y fraudulentas simulaciones, sin la asistencia y consejo de su mencionado esposo, y sin que ella se diera exacta cuenta de sus actuaciones por mor de su deficiente desarrollo mental, su estado de depresión nerviosa y la ofuscación mental a que se encontraba sometida, la indujeron y obligaron a firmar la escritura cuya nulidad se solicita.

La alegación básica de la demanda aparece contenida en el párrafo décimo de la misma que lee así:

"10. Que la titulada operación de compraventa, usufructo y censo, consignada en la escritura número 77 de 15 de agosto de 1956, fue un acto simulado, ficticio y engañoso, sin concurrir en tal transacción el libre consentimiento de la demandante Carolina Diez Ramos ni causa válida en derecho, no habiendo equidad en la transacción, ya que aparecen vendidas por $40,000.00, unas propiedades que al tiempo de otorgarse la dicha escritura tenían y tienen en el mercado un valor no menor de $80,000.00 y que ni siquiera se hicieron efectivos los referidos $40,000.00, conllevando así esta operación un enriquecimiento injusto de los demandados Pedro José Díaz Diez y su esposa, a expensas de la supuesta vendedora, aquí demandante, quien por razón de su deficiente desarrollo mental, su depresión nerviosa y su turbación mental debido al secuestro de que fue víctima, no pudo percatarse de que era objeto de una burla de sus derechos y del despojo ilegal de sus bienes."

Después de haber sido trasladado el pleito a la Sala de Caguas del Tribunal Superior y contestada la demanda, se celebró la vista en la cual las partes adujeron prueba oral y documental.

En 4 de mayo se dictó sentencia declarando sin lugar la demanda. El tribunal de instancia formuló las determinaciones de hecho que copiamos a continuación:

"1. La demandante nació en Caguas en el año 1902, y en Caguas ha vivido desde entonces. Es una mujer de poca instrucción, que se ha desenvuelto en la comunidad de Caguas sin que su competencia mental haya sido puesta en duda por sus vecinos, entre ellos distintos notarios ante quienes otorgó escrituras, y funcionarios ante quienes contrajo matrimonio dos veces, y se divorció una, antes del año 1957.

"2. La demandante era dueña de una finca de poco más de dieciséis cuerdas, con una vieja casa que se dividía en varias viviendas. Desde el año 1935, por lo menos, venía ella arrendando la finca (excepción hecha de la casa y su solar) a su hermana Inocencia, y al hijo de ésta, el demandado Pedro José Díaz Diez. El último arrendamiento, hecho a Pedro José Díaz Diez, se otorgó

en el año 1954 por un canon mensual de $46.00, por 5 años, con dos opciones sucesivas de cinco años cada una.

"3. Allá para mediados del año 1956 Martín Caballero y la demandante decidieron vender la finca. Acudieron al alcalde para que les recomendara un abogado con quien tratar el asunto. El alcalde les recomendó al Lic. J. E. González Quiñones. Visitaron a éste, le expusieron su pretensión, y González recurrió a un corredor, Mariano Molina, quien exigió una opción. Caballero y la demandante prefirieron que en la opción figurara también González Quiñones y eventualmente Caballero y su esposa otorgaron escritura de opción de venta a favor de Molina y de González Quiñones por un precio de $25,000, *precio que fijó el propio Caballero*.

"4. Luego de otorgada la escritura de opción, los dueños de la opción ofrecieron la finca en venta al arrendatario Pedro José Díaz Diez, por $30,000. Se molestó éste al enterarse de la opción, y temiendo que el producto de la venta fuera disipado por Martín Caballero, temor que la prueba sugiere no carecía de fundamento, acudió al Juez José Villares Rodríguez, pariente por afinidad de la demandante, para ver si era posible disuadirla de la venta, y dejar sin efecto la opción.

"5. Se celebró una reunión en la oficina del Juez Villares, pero la demandante se mantuvo firme en su propósito de seguir adelante con el negocio y el demandado anunció entonces que compraría la finca. Sobrevino luego un disgusto entre Caballero y la demandante. Temerosa ésta de que si vendía la finca a cambio de efectivo Caballero le pudiera disipar el producto de la venta, le comunicó sus temores a su sobrino Pedro José, y éste la refirió al Lic. González Quiñones, quien consultó con el Juez Villares. Como resultado, Díaz Diez resolvió comprar a Molina y a González Quiñones, en vez de la finca, la opción, pagando $5,000.00 por la misma, y posteriormente se otorgó, el 15 de agosto de 1956, la escritura número setenta y siete ante el Notario J. E. González Quiñones, mediante la cual la demandante vendió la finca a Pedro José Díaz Diez por un precio consistente en: (a) $8,913.77, importe de una hipoteca sobre la finca, y de otras cantidades que adeudaba la demandante al comprador (b) una renta vitalicia de $100.00 a pagarse por el comprador a la vendedora, garantizada hipotecariamente (c) el usufructo vitalicio de una residencia para la demandante, residencia que venía rentando $65.00

mensuales antes de adquirir la demandante su usufructo. A los fines de la escritura de venta, el notario atribuyó a la renta vitalicia y al usufructo vitalicio de la residencia un valor de $31,124.90, obteniendo así un precio total de venta de $40,038.65. No exageró el notario el valor de la renta vitalicia y del usufructo vitalicio. La prueba demuestra que tenía no menos de ese valor, ya que en esa época a la demandante le hubiese costado $36,817.11 adquirir en el mercado, de una compañía de seguros, una renta vitalicia de $165 mensuales.

"6. Como consecuencia del disgusto habido entre la demandante y su esposo, y temerosa ella de la reacción de éste al enterarse que la venta no le habría de proporcionar dinero en efectivo, quiso ella huir de su esposo, y para ello recabó la ayuda de su sobrino Pedro José y de su hermano Rafael, quienes la llevaron, por indicación de ella, a casa de una amiga de ella en Santurce. Posteriormente, unos dos meses después de su fuga a Santurce, regresó ella a vivir a Caguas, con otra amiga, y finalmente se reconcilió con su esposo.

"7. En 1957 y 1958 otro sobrino de la demandante, Federico Diez Rivas, se interesó en anular la venta hecha por la demandante a Pedro José Díaz Diez, la llevó a San Juan donde distintos psiquiátras y psicólogos. En una ocasión, en el 1958, la propia demandante quiso someterse a tratamiento y voluntariamente ingresó en la Clínica Juliá por un período breve.

"8. En 8 de julio de 1959 radicó la demandante demanda pretendiendo anular la venta a Pedro José Díaz Diez. Juró la demanda la propia demandante. Luego, el 4 de agosto de 1960, la demandante desistió de esa demanda, luego de haberse radicado otra idéntica a su nombre, por Federico Diez Rivas, designado 'defensor judicial' por el Tribunal Superior, Sala de San Juan, en un procedimiento ex parte en el cual el Tribunal Superior, Sala de San Juan (es significativo que no se recurriera a la Sala de Caguas donde correspondía instarse el recurso, jurisdicción donde eran bien conocidos la demandante y su esposo), determinó el 28 de julio de 1960, que la demandante estaba entonces 'incapacitada para administrar su bienes'.

"9. Las opiniones de los distintos testigos respecto al valor en el mercado de la finca a la fecha de la opción y venta varían, desde un mínimum de veinticinco o treinta mil pesos a un máximum de $63,750. Teniendo en cuenta (1) la disposición de

Caballero de vender por $25,000 (2) la disposición de los condueños de la opción, entre ellos personas muy conocedoras de los valores de la propiedad inmueble en Caguas, de vender, como en efecto vendieron, a base de un valor de $30,000, y (3) la prueba pericial, entendemos que la finca no tenía un valor en el mercado superior a $30,000.

"10. La demanda parte fundamentalmente de la premisa de que el demandado Pedro José Díaz Diez se valió de medios impropios para lograr que la demandante concediera una opción de venta de manera que él pudiera adquirir la finca. *La prueba toda establece definitivamente que el demandado nada tuvo que ver con la concesión de la opción, ni con la decisión de la demandante de vender la propiedad. Fue la propia demandante, y su esposo Martín Caballero, quienes decidieron vender, quienes decidieron conceder la opción y quienes fijaron a la finca el precio de $25,000, precio que no puede considerarse inadecuado.*

"11. En cuanto a la incapacidad de la demandante, no hay prueba alguna que indique que no estuviera capacitada para administrar sus bienes en el año 1956. La resolución del Tribunal Superior, Sala de San Juan, determina que no estaba capacitada en el 1960. La prueba pericial, consistente en informes escritos de los psicólogos Dieppa y Sifre, y cartas de los psiquiátras Tejedor, Roselló y Homedes, demuestran (1) Que en el 1958 se le diagnosticó esquizofrenia tipo paranoide (2) Que Sifre la examinó en abril de 1957, y concluyó que su nivel intelectual era fronterizo, es decir, estaba en la frontera entre lo normal y lo deficiente (3) En mayo de 1957 la examinó Dieppa y encontró que era mentalmente deficiente. Luego rectificó Dieppa . . . y convino en que la diferencia en los resultados de los exámenes de los dos psicólogos obedeció a que 'el Sr. Sifre pudo obtener una buena relación con fines de examen con la Sra. Diez Ramos' mientras que cuando Dieppa la examinó ella estaba *'muy asustada',* y 'no hay duda que tal estado emocional contribuyó grandemente a que ella no pudiera responder adecuadamente a las preguntas que yo le hiciera'. Debe añadirse aquí que, aunque Dieppa supone que la demandante estaba tranquila cuando la examinó Sifre, ello no fue así, según el propio Sifre, quien nos dice que 'se encontraba nerviosa y el examen en sí ayudó a crear cierta tensión que no disipó por completo'.

"12. No hay duda de que, a partir de la decisión de la demandante y de Caballero de vender la finca, y debido a los disgustos que resultaron de esa decisión, y posteriormente debido a los esfuerzos . . . que incluyeron los exámenes a los cuales sometieron a la demandante para probar su capacidad mental, la demandante ha sufrido conmociones emocionales desde el año 1956, las cuales, según las opiniones de los peritos que obran en autos, deben haberla afectado mentalmente. A pesar de ello, y a pesar de la prueba que para ella indudablemente representó el juicio celebrado en este caso, y especialmente su declaración como testigo, declaró en forma normal y competente, completamente consistente con el historial de capacidad mental que se le conoce en su propia comunidad. A lo sumo, la prueba pone en tela de juicio la capacidad mental de la demandante para administrar sus bienes en el 1957 y en el 1958. Ciertamente no establece la incapacidad de la demandante en julio y agosto de 1956.

"13. La intervención del Juez Villares Rodríguez ha sido atacada por la parte demandante en una forma violenta e injustificada. La prueba demuestra que el Juez Villares Rodríguez intervino como pariente de la demandante y que su intervención no tuvo otro propósito, ni otro resultado que el proteger los intereses de la demandante. Estos intereses estaban amenazados por la naturaleza del negocio que entre la demandante y su esposo Martín Caballero se proponían llevar a cabo, a saber, la venta de la finca por $25,000 en efectivo. Cuando la demandante se dio cuenta del peligro que representaba para ella el convertir todos sus bienes en dinero en efectivo, los consejos de su pariente, el Juez Villares Rodríguez, la ayudaron a encontrar una alternativa mucho más beneficiosa para ella." (Bastardillas nuestras.)

En el recurso de revisión interpuesto se señalan siete errores que básicamente se dirigen a impugnar la apreciación de la prueba. (2)

---

(2) Los errores señalados son los siguientes:

"1—Las conclusiones con respecto a los hechos sustanciales del caso, que sirven de base a la sentencia, no están sustanciadas, justificadas ni encuentran apoyo en la evidencia admitida en el acto del juicio, y tales conclusiones de hechos son inequívocamente erróneas, caprichosas y arbitrarias."

"2—No tomó en consideración la Resolución del Tribunal Superior, Sala de San Juan, declarando que la demandante Carolina Diez Ramos

Hemos examinado detenidamente la transcripción de evidencia, así como la prueba documental presentada. Todas y cada una de las determinaciones de hecho del tribunal a quo están sostenidas por la prueba que desfiló en el acto del juicio. Esto por sí solo sería suficiente para anular el auto expedido. Sin embargo, deseamos señalar que alegaciones básicas de la demanda quedaron huérfanas de toda prueba y especialmente la que se refiere a que el demandado Pedro José Díaz indujo a la demandante a otorgar la opción de compra a favor de los señores Molina y González. Lejos de establecer tal hecho la prueba revela en forma incontrovertida que dicho demandado tuvo conocimiento de tal transacción después de haberse formalizado la misma. Es significativo en extremo que la referida escritura de opción fue firmada conjuntamente por la demandante y su esposo, luego de haber otorgado un documento privado del mismo tenor; y que la misma establece como precio para la finca la suma de

---

'tiene un deficiente desarrollo mental, habiendo podido cursar estudios únicamente hasta el cuarto grado de la escuela elemental y demostrando un cociente de inteligencia de 40 a 50 aproximadamente, que ha padecido y padece de psicosis y que ha carecido y carece actualmente de juicio, capacidad y entendimiento para administrar sus bienes.' Ni tomó en consideración el testimonio siquiátrico del Dr. Juan Roselló y el Dr. Fernando Texidor Pascual, que sirvió de base a la citada Resolución de incapacidad del Tribunal. Dicho Tribunal no tomó en consideración que la probada incapacidad, falta de juicio y de entendimiento de la demandante para administrar sus bienes vician de nulidad el consentimiento dado por ésta en la escritura número 77 de 15 de agosto de 1956 impugnada en este recurso."

"3—No tomó en consideración el secuestro de que fue víctima la demandante al tiempo de la firma de la referida escritura, por parte del demandado Pedro Díaz Diez, quien contra la voluntad de aquélla la trasladó de su residencia en Caguas, donde vivía en la compañía de su esposo don Martín Caballero, a la casa de una amiga en Santurce, presionándola y forzándola durante tal secuestro a firmar la escritura, bajo violencia, intimidación y mediante dolo, y sin la asistencia ni el consejo de su esposo lo que, a su vez, anula el consentimiento, conforme a lo dispuesto en el Código Civil de Puerto Rico. (31 L.P.R.A. 3404.)"

"4—No tomó en consideración que en los contratos de compraventa, usufructo y censo consignados en la citada escritura no hubo concierto de voluntades de las partes, ni entendimiento de la naturaleza de las

$25,000, de la cual la demandante solamente hubiese recibido la cantidad de $17,754.54 una vez deducido el importe del gravamen hipotecario y sus intereses, así como las contribuciones territoriales que se adeudaban. A cambio de esta suma, que era la mayor que la demandante hubiese recibido bajo el contrato de opción que otorgó en compañía de su esposo, en la transacción que posteriormente se realizó mediante la escritura que se impugna y pretende anular, recibió el derecho de usufructo vitalicio que le garantiza albergue mientras viva y una renta de $100.00 mensuales que le asegura igualmente su subsistencia. La explicación para haber cambiado la prestación a favor de la cedente surge claramente de la transcripción: evitar que la demandante recibiera una suma en efectivo que podía fácilmente ser disipada, si no por ella, por su esposo, exponiéndola a un total desamparo en su vejez. De ahí la intervención del Juez Villares, quien como familiar y amigo de las partes, ayudó a que la transacción se realizara

---

obligaciones, estipulaciones y condiciones fijadas, en lo que se refiere a la demandante Carolina Diez Ramos, por razón de su deficiente desarrollo mental."

"5—No tomó en consideración que la titulada operación de compraventa, usufructo y censo, consignada en la referida escritura número 77 de 15 de agosto de 1956, fue un acto simulado, ficticio y engañoso, sin concurrir en tal transacción el libre consentimiento de la demandante Carolina Diez Ramos, ni causa válida en derecho, ni equidad, ya que aparecen vendidas por $40,038.65 unas propiedades que, al tiempo de otorgarse dicha escritura, tenían en el mercado un valor no menor de $65,000.00 a $80,000.00, y que ni siquiera se hizo efectiva la mencionada suma de $40,038.65, conllevando así esta operación un enriquecimiento injusto de los demandados Pedro José Díaz Diez y su esposa, a expensas de la supuesta vendedora, aquí demandante, quien por razón de su deficiente desarrollo mental, su depresión nerviosa y su turbación mental debida al secuestro de que fue víctima, no pudo percatarse de que era objeto de una burla de sus derechos y del despojo ilegal de sus bienes."

"Sexto y Séptimo Errores. También sometemos estos dos errores con los argumentos expuestos en nuestro Memorándum anterior y muy especialmente con los testimonios que obran en el Récord Taquigráfico, que revelan a todas luces que el Tribunal a quo no decidió este caso con la recta imparcialidad que corresponde a una sana administración de la justicia."

en la forma más conveniente a los intereses de la demandante. Los calificativos con que se describe la actuación de dicho magistrado en el alegato de la recurrente no están justificados.

Respecto a la alegación sobre la incapacidad mental de la demandante precisa aclarar que la prueba admitida sobre este extremo es sumamente tenue. En el recurso ante nos la parte demandante pretende que consideremos los testimonios que tuvo ante sí el Tribunal Superior, Sala de San Juan, en el expediente en que se declaró la incapacidad mental y se le designó defensor judicial. Como surge de la resolución dictada en 1ro de mayo de 1962, la prueba ofrecida en el expediente de incapacidad fue admitida a los únicos fines de "demostrar la prueba que tuvo ante sí la Sala de San Juan al entender en el procedimiento citado y no a los fines de establecer que fuera cierta dicha prueba." Ello tenía que ser necesariamente así, pues los recurridos no fueron parte ni se les citó en el expediente de incapacidad. Excluida esta prueba, solamente figuran en el presente caso ciertas certificaciones expedidas por los doctores F. Tejedor Pascual, Juan Homedes, Juan A. Roselló, Jorge A. Dieppa y Pedro A. Sifre Franco. Las hemos examinado y, consideradas en el aspecto más favorable a la recurrente, de las mismas aparece que ésta padecía de una deficiencia intelectual para las fechas en que fue examinada por dichos médicos todas las cuales fueron con posterioridad a la firma de la escritura. Es cierto que en el informe de 11 de mayo de 1957 del Dr. Jorge A. Dieppa se hizo constar que el historial sugiere que "esta condición [defecto intelectual severo] data desde mucho tiempo, posiblemente desde que nació." Pero esta conclusión, sin más, consideradas en conjunto todas las circunstancias que rodearon el otorgamiento de la escritura, no puede conducirnos a anular la misma.

Otro de los aspectos del caso que se discuten con mayor énfasis se refiere a la valoración de los inmuebles objeto del

contrato. En cuanto a esto la prueba es contradictoria. La alegación de la demanda es al efecto de que el valor de los mismos no era menor de $80,000; la prueba misma de la demandante estableció un valor de sólo $63,750.00; el perito de los demandados lo fijó en $28,094.00; el tribunal de instancia indicó a este respecto que no tenía un valor en el mercado superior a $30,000. Esta determinación encuentra apoyo en la prueba, especialmente si se considera que la propia demandante, asistida por su esposo, concedió una opción por $25,000. Además, no puede ignorarse el factor de depreciación en su valor que constituía el contrato de arrendamiento cuyo término expiraba en 1969 y que por estar inscrito en el Registro de la Propiedad tenía que ser respetado por cualquier tercer adquirente.

Tampoco interpretamos que la manifestación de un testigo al efecto de que se trataba de un contrato complicado tenga mayor alcance que el de tratarse de un contrato poco usual y corriente. En realidad, sus términos, desprovistos de los calificativos jurídicos, son relativamente sencillos. Se trata simplemente de que la demandante fue liberada del pago de ciertas deudas cuya existencia no se cuestiona y recibió además unos derechos de usufructo y renta vitalicia.[3]

Finalmente, no podemos convenir con que la recurrente fue "secuestrada" y ocultada fuera de Caguas como parte del plan para lograr el traspaso de los inmuebles. La prueba no establece tal hecho. Por el contrario, se demostró cumplidamente que la separación de ella de su esposo obedeció a diferencias que la hicieron proyectar hasta un divorcio. Al efecto,

---

[3] Hasta el 5 de junio pasado la recurrente había recibido rentas por $8,200, y había disfrutado de un inmueble que a razón de $65 mensuales, importa $6,150, o sea un total de $14,350. El arrendamiento de uno de los inmuebles bajo los términos del contrato existente le hubiese producido únicamente $3,772.00; la prueba establece que aunque el otro inmueble estaba arrendado a razón de $70 mensuales, generalmente los inquilinos no pagaban los alquileres.

590

encomendó el asunto al abogado González y le urgió por escrito para que lo tramitara. Tan pronto significó su deseo de regresar a Caguas fue complacida.

*En virtud de todo lo expuesto, se anulará el auto expedido y se confirmará la sentencia dictada por el Tribunal Superior, Sala de Caguas.*